*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DANIEL LEE BOWMAN,

        Defendant-Appellant.

UNPUBLISHED
December 21, 2023

No. 361291
Ogemaw Circuit Court
LC No. 20-005366-FC

Before: HOOD, P.J., and JANSEN and FEENEY, JJ.

PER CURIAM.

Defendant Daniel Lee Bowman appeals his convictions of carjacking, MCL 750.529a, and unlawfully driving away an automobile (UDAA), MCL 750.413, following a jury trial. The trial court sentenced Bowman as a fourth-offense habitual offender, MCL 769.12, to concurrent prison terms of 225 months to 50 years for carjacking and 48 months to 50 years for UDAA. We affirm.

## I. BACKGROUND

## A. OFFENSE CONDUCT

This case arises out of Bowman's theft of a pickup truck and driving away while the victim, Andrew Grindstaff, tried to stop him. In late February 2020, Bowman convinced his daughter and her friend to go on a search for his white 1997 Chevrolet pickup truck that he claimed his girlfriend took after dropping him off at a hospital the night before. They stopped after seeing a white 1997 Chevrolet pickup truck at a gas station. Bowman's daughter told Bowman that the truck, which unlike his had a red tailgate, was not his truck. At trial, it was undisputed that Bowman's truck did not have a tailgate. According to Bowman's daughter, after Bowman saw the tailgate on the truck, he said, "That's not my truck." After leaving the gas station, Bowman told his daughter's friend to turn around. They returned to the gas station and followed the truck to a house. Bowman's daughter told Bowman twice while following the truck that the truck was not his. Bowman again said, "That's not my truck."

When the driver of the truck went into the house, Bowman exited his vehicle. He testified that he entered the truck and started it with the key that was still in the ignition. Notably, the

ignition of Bowman's own pickup truck was broken and could not be started with a key. Bowman testified that he intended to take the truck because he believed it was his, but that he had no intention to steal the truck and that it was "all a misunderstanding." He reversed the truck and began to drive off.

According to Bowman, Andrew Grindstaff, the owner of the truck, whom Bowman did not know, jumped into the truck as soon as Bowman put the truck into reverse. Grindstaff showed Bowman the registration to prove his ownership of the truck and offered to help Bowman look for his truck. He also suggested driving to the home of another man to see if Bowman's truck was there. Instead, Bowman testified, he drove to his parents' home.

When Bowman heard sirens, he fled his parents home. He did not explain to officers that he had made a mistake. He later explained that he was scared because Grindstaff "showed me that the vehicle was his." During trial, Bowman said, in a nonresponsive answer to a question, that he "already knew he was gonna end up going to jail." He said that "when they dragged me out of the hospital the night before . . . they denied me medical treatment in the midst of an overdose."

Grindstaff, the owner of the white 1997 Chevrolet truck, provided a different version of events. Grindstaff testified that as soon as he got into his house and shut the front door he heard his truck starting. He opened the front door and saw his truck backing out of the driveway, so he ran after it. Grindstaff caught up to the truck, grabbed the front passenger-side door, and opened it as the driver, whom he did not know, tried to drive off. Grindstaff had one hand on the truck's door frame and one hand on the door handle. He positioned himself between the door and the truck and tried jumping inside. As he did so, Grindstaff asked Bowman what he was doing. According to Grindstaff, Bowman said that the truck was his and that he was taking it. Grindstaff tried to tell Bowman that the truck was not his, but Bowman refused to listen and drove off down the road, dragging Grindstaff roughly 60 to 100 yards at 20 to 30 miles per hour. Grindstaff either had to get into the truck or risk getting run over. When the truck slowed as it was approaching a cross street, Grindstaff got inside the truck.

Grindstaff again asked Bowman what he was doing. Bowman said that the truck was his, that it was stolen from him, and that he was taking it back. Grindstaff testified that Bowman "didn't seem right." Grindstaff offered to show the registration for the truck prove to Bowman that the truck belonged to Grindstaff, but Bowman kept driving. When Bowman told Grindstaff to show him the registration, Bowman looked at the registration and said, "Anybody could print something like that off." Bowman continued driving. Grindstaff testified that he did not call 911 from his cell phone because he did not want to agitate Bowman.

According to Grindstaff, Bowman was eerily calm for the situation and that frightened him. He was scared because he did not know if Bowman was "taking him to the woods" or to "someplace where he had friends." Bowman drove to a house and stopped the truck and tried to get out of the driver's door. He asked Grindstaff how to open the driver's door.[1]  Bowman

---

[1] Grindstaff testified that the inside door handle on the driver's side was broken and that the door could be opened only by pulling on a piece of metal inside the mechanism.

followed Grindstaff out of the passenger door. A man later identified as Bowman's father immediately came running out of the house and yelled to Bowman, "What are you doing? This isn't your truck. That's—doesn't even—it's not like your truck. This ain't your truck."[2] Bowman gave the keys to Grindstaff, who said, "I'm calling the cops." Law enforcement officers arrived at the Bowman home and, after being informed that Bowman had fled into the woods, followed tracks in the snow leading away from the yard and found Bowman hiding in the snow covered by chairs inside of another residence's tiki hut. The prosecution charged Bowman as a fourth-offense habitual offender with carjacking and UDAA.

## B. COMPETENCY ISSUES

Throughout the pretrial phase, the trial court refered Bowman for compentency evaluations three times. Each time he was determined to be competent to stand trial. The court also refered him for an evaluation of criminal responsibility, but Bowman refused to participate in that evaluation. The trial court first ordered Bowman to undergo a competency examination at the Center for Forensic Psychiatry (CFP) to determine whether he was competent to stand trial in mid-March 2020. In late April 2020, Dr. Jay Witherell, a licensed psychologist with CFP, interviewed Bowman. Dr. Witherell issued a report in early May 2020 opining that Bowman was competent to stand trial. In early September 2020, the parties stipulated to entry of an order requiring Bowman to undergo a second competency examination with the CFP. In mid-March 2021, the trial court ordered Bowman to undergo a third examination at the CFP to determine whether he remained competent to stand trial. According to the CFP report issued in early July 2021, though Bowman appeared for the examination, he refused to cooperate because he had "already been forensically evaluated." Dr. Andrew P. Cheff, another licensed psychologist with the CFP, issued the report and opined that, based on the "available information," there was "insufficient support that Mr. Bowman [was] incompetent to stand trial and thus it [was his] opinion that [Bowman] should be presumed competent to stand trial."

During this time, Bowman had frequent outbursts during pre-trial proceedings, including before and after his examinations with the CFP. During the preliminary examination, the court muted Bowman's microphone because of an outburst during a prior proceeding. During the final pretrial and plea cutoff hearing regarding three separate cases, including possession of methamphetamine charges that stemmed from traffic stops, the prosecutor placed the plea agreement for the present case on the record. Bowman rejected the plea offer, but not before an outburst during which he claimed law enforcement smashed his face to the ground, pushed him out of the hospital "to die," indicating that he would only agree to one year in jail, and indicating he would call 20 witnesses if the case went to trial. The court told Bowman that if during trial "you continue to outburst like this, you're gonna be doing your trial from another room watching it on television." The court also told Bowman, "So you either get your act together or you don't, it's up to you, but I'm not gonna have this courtroom turned into a circus because you can't keep your mouth shut."

---

[2] Bowman's father, Gary Bowman, testified that he looked the truck over before he determined the truck was not Bowman's truck.

During a status conference in late April 2021, Bowman told the court that he wanted to file charges of attempted murder against the officers who dragged him out of the hospital, alleging police brutality. When addressing bond, he continued to insist that the state police dragged him out of the hospital. He claimed the cases against him were "illegal" and that police targeted and physically abused him "15 times in a . . . 3-week span," leading to "attempted murder caught on camera . . . ." He continued, "I know my rights. I did a forensic test, passed it." And he referred to the charges as "some bogus ass shit . . . ." The court told Bowman that he had to control himself or he would be removed from the courtroom. Bowman responded that the alleged abuse was on camera. The court told Bowman that it had heard his story four times and that "I need you to stop now." Bowman said, "I'm clearly upset."

During his various pretrial hearings, Bowman made outbursts about perceived procedural defects in his case unrelated to the pretrial hearings. For example, during a hearing on defense counsel Darris Richards's motion to withdraw, Bowman continued asserting that officers tried to murder him and reiterated that the officers' conduct was "caught on camera." During a status conference in early October 2021, Bowman again said that officers dragged him out of the hospital and tried to murder him. He reiterated these same allegations during a January 2022 hearing on the prosecution's motion to consolidate all of the pending cases for trial. Later during that same hearing, Bowman again said, "I know my rights very well through this law book right here[.]" He said, "Like I've told you—they caught me red-handed. . . . They did. . . . They read me my Miranda warning. . . . I—there ain't no way around that. . . . But I can prove otherwise—it was illegally done." He then claimed that when the district court judge bound him over for trial, the judge said, "I'm bounding this over to the circus. . . . He did not say circuit. Or maybe it was the evil spirit and the spirits that kinda brought it was me or something, I don't know, but it 'miscombulated' his mind." The preliminary examination transcript does not reflect that the court ever used the word "circus."

At the hearing on remand,[3] Bowman's first appointed counsel, Richards, testified that he was originally appointed to represent Bowman on the carjacking and UDAA charges as well as on charges of possession of methamphetamine in other cases. He described Bowman as "very difficult," and their relationship as "not good." Richards explained that when Bowman was first arrested on the charges in this case "they had to bring him over to the court in a wheelchair. He did not know why he was there. He did not know what he was charged with. He did not know what happened." Richards testified that when he was able to meet with Bowman a few days later "he was very contentious," had his "own view of how the case needed to be defended which basically revolved around a claim that the sheriff's deputy tried to kill him by making him . . . leave the hospital and cross the road, and that his prior convictions needed to be vacated and then he would be found not guilty." Richards said that he requested a forensic evaluation for competency and criminal responsibility.[4] He said that the competency evaluation was completed

---

[3] *People v Bowman*, unpublished order of the Court of Appeals, entered November 29, 2022 (Docket No. 361291).

[4] At a status conference in early September 2020, Richards requested the forensic examinations. At the hearing on remand, Richards testified on cross-examination that he told defendant multiple

-4-

and that he received a report from the examiner at CFP indicating that defendant was competent to stand trial. Richards said that the way the report was written indicated that Bowman cooperated with the examiner. He also testified that the examiner at the CFP provided a letter to the court regarding Bowman's referral for evaluation of criminal responsibility. The letter informed the court that CFP did not complete a criminal responsibility evaluation, explaining:

> Mr. Bowman was provided information regarding the insanity defense, the purpose of the criminal responsibility evaluation, and information he would be asked during a criminal responsibility evaluation. Mr. Bowman appeared to understand the information when asked. Mr. Bowman asserted that he was not currently interested in asserting an insanity defense and did not wish to continue with the criminal responsibility evaluation. He declined to participate in evaluation in a polite and respectful manner. He cited logical reasons for why he did not wish to pursue an insanity defense at this time. As Mr. Bowman declined to participate in the evaluation for logical reasons, the evaluation could not be conducted. If he or his attorney changes their mind and decides to assert a defense of Not Guilty by Reason of Insanity, he can be re-referred for evaluation at that time.

Richards testified that trial was delayed because of the COVID-19 pandemic. Bowman remained incarcerated in September 2020. Richards requested a second order for a competency examination, testifying, however, that the CFP could not complete a second competency examination because Bowman would not cooperate. The July 2021 report from the CFP stated that Bowman

> made a statement blaming law enforcement for his incarceration. He said he was not going to talk about it. He then stated he "took a forensic test 10 months ago." He refused to participate in the interview, due to having already been forensically evaluated. He was not cooperative with education and encouragement to participate. He was irritable in his presentation. No formal mental status examination was completed due to his unwillingness to participate in the interview.

The report indicated that the examiner performed a review of Bowman's CFP records:

> Review of Mr. Bowman's CFP record indicates he was most recently (and for the last time) evaluated at the CFP on April 24, 2020. . . . Dr. [Jay] Witherell issued a report on May 4, 2020, opining Mr. Bowman competent to stand trial at that time. In that interview, Mr. Bowman reported a history of paranoia and hatred of law enforcement and stated he was referred for mental health treatment at AuSable Valley CMH in the past by his parole officer due to these types of statements. A response to a records request submitted at the time of that evaluation

times that Bowman's trial strategy of focusing on the officers on the night he was at the hospital did not sound reasonable and that "we needed to get the evaluations so that could figure out what was going on." Richards said that "it appeared to me that we had some excessive drug use that affected him mentally. But I was hoping . . . as his time went on . . . in jail he would kinda clear up and he just never did."

indicates there were no records available at the CMH regarding Mr. Bowman. He reported a history of medication intervention though this was through a "medical doctor," according to the report. He denied any other history of mental health treatment including inpatient psychiatric hospitalization. He did not present with any acute mental health concerns. He was at that time assessed to have adequate legal knowledge, application of that knowledge, and capacity to rationally assist in his own defense.

Based on this review, the examiner opined:

> Given that Mr. Bowman refused to participate in this interview, and no additional collateral information was received in spite of attempts to do so, information is limited. It is noted that previously, Mr. Bowman was forensically evaluated and opined competent to stand trial. It is also noted that he has minimal mental health history.

Given the available information, the examiner opined that there was "insufficient support that Mr. Bowman [was] incompetent to stand trial and thus it [was the examiner's] opinion that [Bowman] should be presumed competent to stand trial."

Richards testified that he tried to have discussions with Bowman about his lack of cooperation with the examinations and that every time "it immediately evolved into arguing and him wanting me to get the video of him . . . nearly getting hit and to vacate his convictions."[5] He said that Bowman understood his rights and believed that to defend his case, they had to "collaterally attack his prior conviction and to prove that the sheriff's department tried to kill him." At the evidentiary hearing on remand, the prosecutor questioned Richards:

> *Q*. Okay. Now, in hindsight, is there anything that you could have done different to establish competency or criminal responsibility that you didn't do in this case?
>
> *A*. I don't believe so. I mean, if he's not—if he wasn't gonna cooperate with the—the evaluations, there's really nothing you can do.
>
> *Q*. Yeah, 'cause these—these evaluations in that defense does require cooperation, correct?
>
> *A*. Yes.

---

[5] During a status conference in late April 2021, Richards said that he explained to Bowman the necessity of having the competency examination but that Bowman absolutely refused to participate. The court asked Richards whether he was going to be "presenting competency issue or criminal insanity as a defense." Richards said that Bowman would not cooperate with the examinations.

Bowman's second appointed counsel, Duane Hadley, testified that he also communicated with Bowman about criminal responsibility and competency. Hadley testified they "had a couple of conversations relevant to that, relative to possibly having a second request for competency and/or criminal responsibility, which Mr. Bowman vehemently said that he wasn't going to do that." The prosecutor and Hadley had the following exchange in that regard:

> *Q*. Okay. So he said he wouldn't—he would not participate in any type of examination, whether it was public or private, regarding the materials that you needed to mount an insanity defense?

> *A*. Yes. Yes, we discussed the insanity defense. He wanted no part of that, wasn't going to complete competency, criminal responsibility. So we took that off the table pretty early. He said, "Quit addressing it with me, we're not gonna—we're not gonna go down that road."

> \* \* \*

> *Q*. So just to sum up, is it your testimony that a private psychiatric evaluation or a second psychiatric evaluation was not pursued by you because your client refused to cooperate with that line of defense?

> *A*. I—I had—I had avenues and I had resources to be able to do that when I discussed that with Mr. Bowman.[6] He one hundred percent vehemently denied. "Don't do it. I'm not taking it. I'm not participating. Leave it alone. Move on."

> *Q*. Okay.

> *A*. So it was never an issue again.

Upon questioning by defense appellate counsel, Hadley testified that Bowman was always argumentative and agitated. Hadley denied that after reviewing the file he received from Richards he had "any inclinations from the case file that there had been any prior issues with Mr. Bowman's mental status."

On remand, the trial court made the following findings:

---

[6] At a status conference in late July 2021, the court indicated that it had received the July 2021 report from the CFP indicating that Bowman was competent to stand trial. Hadley stated that he had recently become involved in this case but had gone over the report with Bowman. Based on the report and his conversations with Bowman, Hadley had no fundamental objection to the report and did not believe that Bowman had an objection to stipulating to the report. The report was admitted. The court asked Hadley if he was requesting an independent examination. Hadley said that he had spoken with Bowman on that issue and that he did not know what the "next step may be as far as an independent evaluation" and whether he could receive assistance from the Michigan Indigent Defense Commission (MIDC). The court told Hadley to contact the MIDC administrator.

As the record and the testimony today clearly shows, Mr. Richards, while the case was still in District Court, requested a competency evaluation and criminal responsibility evaluations, and those requests were granted by the district court judge as demonstrated by Exhibits 1 and 2. Mr. Bowman was evaluated for competency, found to be competent. The evaluator attempted to explain the insanity defense to Mr. Bowman, and he elected not to participate in that line of defense. Mr. Richards testified that he talked to Mr. Bowman about that defense, and Mr. Bowman indicated time and time again that he had no interest in pursuing an insanity defense or criminal responsibility.

Mr. Hadley testified likewise that those issues were again discussed, and Mr. Bowman did not wish to pursue that trial strategy of insanity defense.

Needless to say, at the second attempt for competency and diminished—or insanity, criminal responsibility evaluation defendant refused to cooperate at all as to both evaluations. And that was again demonstrated in the exhibits that were admitted today . . . . Therefore, it's hard to claim now that the defense counsel did anything wrong or ineffective by not raising insanity at this trial. Quite frankly, they could not raise insanity at the trial. To raise insanity at the trial, they needed to file a notice to do so at least 30 days before trial and they needed to present a report from the [CFP], which they were unable to obtain. Without that report, they have no standing to request an independent report, and they didn't do so. To do so would have been frivolous.

As a result of defendant's own behavior, the [CFP] presumed him to be competent at the second go-around because they had nothing to go on to contradict that. Likewise, neither did his attorney, Mr. Hadley or Mr. Richards. Since the defendant refused to cooperate with the competency and/or criminal responsibility evaluations, the defense attorney had no basis to object to any report and as such failure to object would've—the objection would have been frivolous, nonetheless. Also, since the defendant himself refused to participate in the criminal responsibility evaluation, he had no rights to . . . demand an independent evaluation, and failure by his attorney to do so is not proof now of ineffective assistance of counsel. Again, defendant has failed to establish ineffective assistance of counsel or that the result of the trial would have been different but for [counsel's] actions. In short, defendant prevented the defense counsel from offering the defense of insanity. Because of defendant's refusal to participate, he has failed to show that the insanity defense was a substantial defense that the attorney failed to raise. Defendant has not presented any proof that he was, in fact, insane, and therefore defendant has not proved he had any insanity defense whatsoever that would've impacted on the results of the trial.

## C. TRIAL TESTIMONY RELATED TO PRIOR POLICE CONTACTS

At trial, in addition to Grindstaff's testimony, the prosecution offered testimony of several law enforcement officers, who testified about interactions with Bowman. Michigan State Police Troopers Jason Raymond and Brian Grezeszak both responded to the call related to the stolen truck

and tracked Bowman through the woods. They also testified about prior contacts they had with Bowman. Trooper Raymond and the prosecutor had the following exchange regarding Trooper Raymond's familiarity with Bowman:

> *Q*. Okay. Now, is this the first time you saw Daniel Bowman?
>
> *A*. No.
>
> *Q*. So you recognized the suspect?
>
> *A*. Yes.
>
> *Q*. Okay. And is it safe to say—don't tell me from what—but you knew him from prior contacts?
>
> *A*. Correct.
>
> *Q*. Okay. And can you explain to the . . . jury the defendant's demeanor at that time[?]
>
> *A*. At the time we located him?
>
> *Q*. Yes.
>
> *A*. Just somewhat irrational. We kept trying to initially tell him to show us his hands, he just—he wouldn't take one hand out of his pocket. He just kept saying, "I need my book. I need my book." Wouldn't follow directions. The book he was referring to, he had like a little Bible in his pocket. I mean, you'd try to talk to him, he'd just kinda stare off, and there wasn't much conversation.
>
> *Q*. And was his appearance or demeanor that night similar to other encounters you had with him, or different?
>
> *A*. Pretty similar to all contacts with him.
>
> *Q*. Okay. So that's Daniel Bowman every time you meet Daniel Bowman?
>
> *A*. Yes.

On cross-examination, Trooper Raymond agreed that his testimony on direct examination indicated that he had "other occasions" with Bowman and knew him before the February 2020 incident.

When asked whether he had contact with Bowman before the February 2020 incident, Trooper Grezeszak acknowledged previous contacts. Regarding those contacts, he testified:

> *Q*. And in the course of those contacts, would you say his demeanor on that night was vastly different or the same?

*A.* It was consistent with my prior contacts.

*Q.* Okay. So, you know, how his affect and how he talked to you and his mannerisms were real consistent with what you've seen in the past?

*A.* That's correct.

*Q.* And did you think he was under the influence of any type of intoxicating substance?

*A.* I did not.

*Q.* Did you give him medical for any type of intoxicating substance?

*A.* No.

*Q.* And as an officer you're trained to look for signs of intoxication?

*A.* That's correct.

\* \* \*

*Q.* And did you notice anything that would indicate in any way, shape, or form that Mr. Bowman . . . might have not been under the influence of something?

*A.* I did not. I guess, to answer your question, I did not believe he was under the influence of anything.

\* \* \*

*Q.* And is it safe to say—well, let me ask you this: Mr. Bowman's demeanor, you indicated that it was consistent?

*A.* Yes.

*Q.* Okay. So—but he's always a little weird; right?

*A.* Yes.

*Q.* Okay. And he was acting consistently with his weirdness?

*A.* That's correct.

West Branch Police Officer Joseph Adams testified on rebuttal about his interaction with Bowman the night before the truck incident at Mid-Michigan Hospital in West Branch. Officer Adams was dispatched to the hospital to deal with a "disorderly person that caused the hospital to go into lockdown." He indicated that Bowman became agitated and upset when Officer Adams entered the hospital, but left the hospital on his own. Though Officer Adams did not notice any characteristics of an overdose in Bowman, he noted Bowman was "definitely agitated." The

-10-

prosecutor and Officer Adams had the following exchange about Officer Adams's familiarity with Bowman:

> *Q.* Okay. And did you know Mr. Bowman from previous contacts?
>
> *A.* Yes, I've had contact with Mr. Bowman. Prior to the city police I've worked with the sheriff's office and had contacts with him on complaints and traffic stops.
>
> *Q.* And based on your personal experience with Mr. Bowman, did you—did he appear to be under the influence of anything that night?
>
> *A.* From my contact previously with him that night, it kinda seemed to go hand in hand with his normal personality.
>
> *Q.* And so nothing about his personality was out of the ordinary; correct?
>
> *A.* Not to me, no.
>
> *Q.* Okay. And it's quite common for him to get agitated?
>
> *A.* Yes. With law enforcement.
>
> *Q.* Okay. And—and in fact you were called there because he was being—he was getting agitated with staff?
>
> *A.* Yes.
>
> *Q.* Okay. Now, you didn't arrest him that night; correct?
>
> *A.* I did not.
>
> *Q.* And if a person's being disorderly, they could be arrested; isn't that true?
>
> *A.* That's correct.
>
> *Q.* And is one of the reasons why you didn't arrest him is because even though he was agitated, his typical self, you didn't feel he was a threat to himself or others?
>
> *A.* No, I did not.

### D. JURY VERDICT AND INITIAL SENTENCING

In early March 2022, the jury found Bowman guilty of carjacking and UDAA. Bowman's presentencing investigation report (PSIR) recommended a sentencing guidelines range of 225 months to 750 months' imprisonment, or life in prison. The PSIR had a total Prior Record Variable (PRV) score of 125 (PRV Level F). Relevant to this appeal, it scored PRV 5 (prior misdemeanor convictions) at 10 points. It also had a total Offense Variable (OV) score of 90 points. And

relevant here, that included 50 points for OV 7 (sadism, torture, excessive brutality, or similarly egregious conduct), 15 points for OV 8 (asportation of victim) and 10 points for OV 17 (crimes involved operation of a vehicle). The trial court found that the PSIR accourately scored the Guidelines. But it rejected the recommended range and sentenced Bowman to 225 months to 50 years on the carjacking conviction and 48 months to 50 years for his UDAA conviction, with credit for time served.

## E. APPEAL AND REMAND

Bowman appealed and moved to remand to the trial court. He raised several issues in his motion to remand, including that he was denied the effective assistance of counsel because defense counsel failed to object to the officers' testimony about prior contacts with Bowman and did not pursue a claim that he was not competent to stand trial. He also sought remand to move for a new trial on the ground that the jury verdict was against the great weight of the evidence, asserting that the evidence indicated he truly believed the truck was his and therefore he did not intend to unlawfully take the truck. Finally, Bowman argued that he was entitled to resentencing because PRV 5 and OVs 7, 8, and 17 were incorrectly scored. In late November 2022, this Court granted Bowman's motion and remanded to the trial court for an evidentiary hearing on the issues in Bowman's motion to remand. *People v Bowman*, unpublished order of the Court of Appeals, entered November 29, 2022 (Docket No. 361291). This Court retained jurisdiction jurisdiction. *Id*.

On remand, Bowman's two former attorneys, Duane Hadley and Darris Richards, testified about their representation of Bowman. Relevant here, this included testimony about their pursuit of competency evaluations and Bowman's refusal to cooperate, Hadley's decision not to object to the testimony about prior police contact with Bowman because he did not consider the testimony to be "objectionable," and Hadley's conversations with Bowman during which Bowman "took [the insanity defense] off the table pretty early" and told Hadley to stop addressing the issue with him. Hadley also testified about his decision whether to object to certain PRV and OV scores. When asked whether Bowman's conduct was "egregious enough to" assess 50 points for OV 7, Hadley stated: "Well, I believe that the jury c[a]me to that conclusion." Hadley acknowledged that he did not object to OV 8 related to asportation nor OV 17 related to reckless disregard for the victim's life. Hadley also acknowledged that one of Bowman's conviction was a one-year misdemeanor, stating that "if you're scoring PRV it's just [the] number of how many prior low severity . . . misdemeanor convictions." At the hearing on remand, the prosecution conceded that PRV 5 was incorrectly assessed 10 points and should have been assessed 5 points instead. It noted, however, that this did not change Bowman's guidelines and he was therefore not entitled to resentencing.

The trial court agreed that PRV 5 was improperly scored and corrected the score to 5 points. Regarding OVs 7, 8, and 17, however, the court found that they were properly scored at 50, 15, and 10 points, respectively. The trial court found that the correction to PRV 5 did not cause a change in the guidelines range, so it found that Bowman was not entitled to resentencing. On the issue of the prior-contacts testimony, the trial court determined that the prosecution was entitled to present testimony contradicting Bowman's claim that he was denied medical care for an overdose the night before the truck incident that, he claimed, caused his mistake about the truck. Regarding the competency and insanity-defense issues, the trial court noted that Bowman was evaluated and found competent to stand trial, and elected not to pursue an insanity defense. It also

noted Bowman's refusal to cooperate with additional competency evaluations. The court therefore rejected Bowman's arguments regarding the ineffective assistance of counsel. It also rejected Bowman's argument that his conviction was against the great weight of the evidence, concluding that a rational factfinder, on the evidence presented, could have found that Bowman knew or should have known beyond a reasonable doubt that the truck was not his. This case returns to us following the remand hearing.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL RELATED TO EVIDENCE OF PRIOR POLICE CONTACTS

Bowman argues that defense counsel was ineffective because he failed to object to the testimony of police officers who indicated they were familiar with Bowman.[7] We disagree.

Bowman first argues that defense counsel's failure to object to the testimony of several police officers that they had prior contacts with Bowman deprived him of the effective assistance of counsel. We disagree. Bowman has not established that counsel was deficient, or that he suffered prejudice.

"To demonstrate ineffective assistance of counsel, a defendant must show that his or her attorney's performance fell below an objective standard of reasonableness under prevailing professional norms and that this performance caused him or her prejudice." *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013). In other words, he must establish deficiency and a resultant prejudice. See *id*. "To demonstrate prejudice, a defendant must show the probability that, but for counsel's errors, the result of the proceedings would have been different." *Id*. The effective assistance of counsel is presumed and the defendant bears the burden of establishing otherwise. *People v Roscoe*, 303 Mich App 633, 644; 846 NW2d 402 (2014).

To establish deficiency, Bowman argues his counsel should have objected to certain testimony as violative of MRE 404(b)(1) and MRE 403. He argues that the jury likely inferred from the evidence of prior police contact that he was a "bad person" guilty of the present offenses because he had prior police contacts.

"MRE 404 governs the admissibility of other-acts evidence. The general rule under MRE 404(b) is that evidence of other crimes, wrongs, or acts is inadmissible to prove a propensity to

---

[7] Whether a defendant has received ineffective assistance of counsel is a mixed question of fact and constitutional law. *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). " 'A judge must first find the facts, then must decide whether those facts establish a violation of the defendant's constitutional right to the effective assistance of counsel.' " *Id*., quoting *People v Grant*, 470 Mich 477, 484, 684 NW2d 686 (2004). "This Court reviews for clear error the trial court's factual findings, and reviews de novo questions of constitutional law." *Armstrong*, 490 Mich at 289. A trial court's factual findings are clearly erroneous if the appellate court is left with a definite and firm conviction that a mistake has been made. *People v Mullen*, 282 Mich App 14, 22; 762 NW2d 170 (2008).

commit such acts." *People v Denson*, 500 Mich 385, 397; 902 NW2d 306 (2017). MRE 404(b) provides in relevant part:

> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case. [MRE 404(b)(1).]

Evidence of a person's character, including evidence of other crimes or prior conduct, is generally inadmissible to show that the person acted in conformity with that character. *People v Starr*, 457 Mich 490, 494-495; 577 NW2d 673 (1998). Testimony may impermissibly reference an "other act" by implication, even if the conduct is not explicitly stated. See *People v Jackson*, 498 Mich 246, 263-264; 869 NW2d 253 (2015). Such "other acts" are admissible, however, pursuant to MRE 404(b) ("a rule of inclusion") for any other purpose "that does not risk impermissible inferences of character to conduct." *Starr*, 457 Mich at 496. See also *People v VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994) (establishing four-part test for admissibility of other acts under 404(b): (1) relevance; (2) proper purpose; (3) MRE 403 analysis; and (4) an optional limiting instruction).

Defense counsel's decision not to object to references to prior police contact was not deficient because these references were not "other acts." During his opening statement, defense counsel stated that Bowman did not intend to carjack, suggesting instead that Bowman mistakenly took the truck due to an untreated medical condition. To rebut this defense, the prosecution offered the testimony of two troopers, Jason Raymond and Brian Grezeszak, who had previous contacts with Bowman to show that his demeanor and behavior was consistent with those prior contacts. Neither trooper described any particular conduct by Bowman. And their testimony that they had prior contact with Bowman did not rise to the level of describing "other acts" that would show Bowman's character or propensity one way or another. Defense counsel testified at the evidentiary hearing that he did not object to the testimony because in his view the prior contacts did not constitute other acts. Even assuming that the troopers' testimony could show character or propensity, it was offered for a noncharacter purpose.[8]

---

[8] Raymond and Grezeszak's testimony about prior contact with Bowman established foundation for their testimony that his behavior on the day of the incident was consistent with his past behavior and demeanor. The prosecution offered this to rebut Bowman's theory that he was suffering from an untreated medical condition that caused him to mistakenly believe that Grindstaff's truck was his own. This evidence was also relevant to an issue other than propensity. See *VanderVliet*, 444 Mich at 74. Whether Bowman's behavior and demeanor on the day of the incident was consistent with his usual behavior and demeanor was a fact of consequence because it would tend to establish or disprove his theory of the case, i.e., whether he was suffering from an untreated medical condition when he took Grindstaff's truck. See *Jackson*, 498 Mich at 276 (concluding that other-

Likewise, defense counsel was not deficient for the decision not to object to the rebuttal testimony of Officer Joseph Adams. In the prosecution's rebuttal case, Officer Adams testified that he had prior contact with Bowman "on complaints and traffic stops." The prosecution offered his testimony to rebut Bowman's testimony that his forceful removal from the hospital the night before the truck incident denied him medical treatment for a drug overdose and that he mistakenly took Grindstaff's truck because of his untreated medical condition. Like Raymond and Grezeszak's testimony, Adams described contact with Bowman, but not other bad acts. And, at the time Officer Adams testified, Bowman had already testified that his truck was registered in someone else's name because "that man [presumably one of the troopers or officers in the courtroom] kept targeting me in my Chrysler 300." Bowman's own testimony indicated that he had prior contact with law enforcement.[9]

Defense counsel was therefore not ineffective for failing to object to the admission of the testimony of Raymond, Grezeszak, or Adams that they had prior contacts with Bowman because the testimony did not violate MRE 404(b). Because the trial court properly admitted that testimony, defense counsel could not have been ineffective by failing to object to its admission. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel"). Without a deficiency, we need not address prejudice.

### III. COMPETENCY AND CRIMINAL RESPONSIBILITY

Bowman also challenges the lack of a competency hearing as a denial of due process, and contends that defense counsel rendered ineffective assistance when he failed to seek an independent psychiatric examination regarding insanity and stipulated to the admission of a report from the Center for Forensic Psychiatry (CFP) finding that Bowman was competent to stand trial.[10] We disagree and address each argument in turn.

---

acts evidence was not unduly prejudicial because it was "necessary to counter the defendant's theory that the . . . allegations . . . were fabricated"). It also survives MRE 403 analysis because neither officer described specific conduct by Bowman. See *VanderVliet*, 444 Mich at 74-75. The prejudicial effect of their testimony was therefore minimal.

[9] For the same reasons explained with respect to the testimony of Raymond and Grezeszak, the prosecution offered Officer Adams's testimony for a nonpropensity purpose, it was relevant, and the probative value of the evidence was not significantly outweighed by a danger of unfair prejudice.

[10] We review for an abuse of discretion a trial court's decision whether the facts brought to its attention gave rise to a "bona fide doubt" about the defendant's competence and imposed a duty on the court to raise the issue of incompetence. *People v Kammeraad*, 307 Mich App 98, 138; 858 NW2d 490 (2014) (quotation marks and citation omitted). We also review for an abuse of discretion the court's determination of whether the defendant is competent to stand trial. *Id*. A trial court abuses its discretion when its decision is "outside the range of reasonable and principled outcomes." *Id*. at 140 (quotation marks and citation omitted).

Although Bowman's statement of issues on appeal references due process concerns regarding his competency, his actual argument focuses exclusively on ineffective assistance of counsel related to that issue. [11] He argues that defense counsel rendered ineffective assistance of counsel when he failed to seek an independent psychiatric examination regarding insanity and when, during a status conference, he stipulated to the admission of a report from the Center for Forensic Psychiatry (CFP) finding that Bowman was competent to stand trial. We disagree.

"Counsel always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012) (quotation marks and citation omitted). Legal insanity at the time the offense was committed is an affirmative defense. See MCL 768.21a(1). "A criminal defendant is denied effective assistance of counsel by his attorney's failure to properly prepare a meritorious insanity defense." *People v Hunt*, 170 Mich App 1, 13; 427 NW2d 907 (1988).[12] Counsel is not, however, ineffective for failing to advance a meritless position. *Ericksen*, 288 Mich App at 201.

MCL 768.21a provides, in relevant part:

(1) It is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense. An individual is legally insane if, as a result of mental illness as defined in section 400 of the mental health code, 1974 PA 258, MCL 330.1400, or as a result of having an intellectual disability as defined in section 100b of the mental

---

[11] Bowman's statement of the issue suggests that he is arguing that the trial court erred by not holding a competency hearing, but this is not the argument presented in the discussion of the issue. Nonetheless, a brief analysis is provided. A criminal defendant is presumed competent to stand trial. MCL 330.2020(1). A defendant "shall be determined incompetent to stand trial only if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner." MCL 330.2020(1). "The protection afforded by the Due Process Clause requires that a court sua sponte hold a hearing regarding competency when any evidence raises a bona fide doubt about the competency of the defendant." *In re Carey*, 241 Mich App 222, 227-228; 615 NW2d 742 (2000). "[T]he test for such a bona fide doubt is whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Kammeraad*, 307 Mich App at 138-139 (quotation marks and citation omitted; brackets in original). "Evidence of a defendant's irrational behavior, a defendant's demeanor, and a defendant's prior medical record relative to competence are all relevant in determining whether further inquiry in regard to competency is required." *Id*. at 139. Additionally, defense counsel's expressed doubt as to a defendant's competency is also a factor that should be considered. *Drope v Missouri*, 420 US 162, 177 n 13; 95 S Ct 896; 43 L Ed 2d 103 (1975). The analysis of the issue with respect to the argument that Bowman actually presents (discussed later) reveals that this issue is without merit.

[12] Though nonbinding under MCR 7.215(J)(1), cases decided before November 1, 1990, are nevertheless precedential under the rule of *stare decisis*, MCR 7.215(C)(2), and are more than just merely persuasive. See *People v Bensch*, 328 Mich App 1, 7 n 6; 935 NW2d 382 (2019).

-16-

health code, 1974 PA 258, MCL 330.1100b, that person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law. Mental illness or having an intellectual disability does not otherwise constitute a defense of legal insanity.

(2) An individual who was under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his or her alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances. [MCL 768.21a(1) and (2).]

There are several procedural requirements that must be satisfied before a defendant may invoke an insanity defense. *People v Carpenter*, 464 Mich 223, 231; 627 NW2d 276 (2001). The requirements are:

A defendant in a felony case who wishes to interpose an insanity defense, must serve written notice on the court and the prosecutor not less than thirty days before trial and submit to a court-ordered examination, relating to the claim of insanity, by personnel for the center for forensic psychiatry or other qualified personnel. MCL 768.20a(1) and (2); MSA 28.1043(1)(1) and (2). A defendant or the prosecutor may also obtain independent psychiatric examinations. MCL 768.20a(3); MSA 28.1043(1)(3). *The failure by the defendant to fully cooperate in either the court-directed or independent examinations, bars the defendant from presenting testimony relating to insanity at trial*. MCL 768.20a(4); MSA 28.1043(1)(4). [*People v Toma*, 462 Mich 281, 292 n 6; 613 NW2d 694 (2000) (emphasis added).]

Bowman has not shown that defense counsel's performance was outside the range of reasonable professional conduct. Bowman's first court-appointed attorney requested an evaluation for competency to stand trial and for criminal responsibility, which the district court granted. The examiner concluded in May 2020 that Bowman was competent to stand trial. Bowman, however, refused to undergo an evaluation of criminal responsibility. Defense counsel explained to Bowman the necessity of the competency and criminal responsibility evaluations. Because Bowman would not cooperate in the court-directed evaluation for criminal responsibility, this defense was likely barred. See *Toma*, 462 Mich at 292 n 6. And defense counsel's decision not to request an independent evaluation did not amount to deficient performance. See *Trakhtenberg*, 493 Mich at 52. Bowman contends that defense counsel's failure to "follow up with getting an independent evaluation" resulted an "an incomplete investigation of the defense of insanity." But the incompleteness of the investigation was caused by Bowman's refusal to cooperate, not any shortcoming in defense counsel's failure to obtain an independent evaluation. See *Fautenberry v Mitchell*, 515 F3d 614, 625 (CA 6, 2008) (concluding that defense counsel "conducted a sufficient and reasonable mitigation investigation under the circumstances [the defendant] created" where the defendant "refused to submit to the [neuropsychological] examination").[13] Given Bowman's

---

[13] Decisions of lower federal courts are nonbinding on this Court but may be considered for their persuasive value. *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

refusal to cooperate with a court-directed evaluation, and his express statements that he did not want to pursue an insanity defense, it was objectively reasonable for defense counsel to not pursue an independent examination. See *Toma*, 462 Mich at 292 n 6.

Bowman also has not presented a factual predicate for his claim that it was objectively unreasonable for defense counsel not to pursue additional examinations. Even considering his claim that the drug overdose caused a mental illness, he cannot establish an insanity defense simply by establishing that he suffered from mental illness. MCL 768.21a(1). Nor can he be considered legally insane just by being under the influence of controlled substances. See MCL 728.21(a)(2). Bowman has failed to establish the factual predicate for his claim. See *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014). He has therefore failed to meet his burden of showing that defense counsel performed deficiently by not pursuing an independent examination.

Finally, Bowman argues that defense counsel was ineffective by stipulating to admission of the CFP's July 6, 2021 report on Bowman's competency to stand trial because the report was based upon incomplete information. But it was Bowman's refusal to cooperate and participate in a second court-directed evaluation for competency to stand trial that resulted in the examiner having "limited information." The examiner nevertheless reviewed the prior CFP record and report and opined that "there was insufficient support that [Bowman] was incompetent to stand trial" and opined that "he should be presumed competent to stand trial." Defense counsel went over the report with Bowman and, on the basis of the report and his conversations with Bowman,[14] did not have a fundamental objection to the report. Nor did he believe that Bowman had an objection to stipulating to the report. Under these circumstances, Bowman has failed to demonstrate that it was objectively unreasonable for defense counsel to stipulate to admission of the competency report.

## IV. GREAT WEIGHT OF THE EVIDENCE

Bowman asserts that the evidence showed that Bowman mistakenly believed that Grindstaff's truck was actually Bowman's missing truck, so Bowman did not have the intent to carjack or unlawfully drive away in the truck. He therefore argues that the jury's verdict was against the great weight of the evidence.[15] We disagree.

---

[14] At the evidentiary hearing, defense counsel testified that he discussed the insanity defense with Bowman. According to defense counsel, Bowman indicated that he "wanted no part of that" and that they "took that off the table pretty early" because Bowman told him to stop addressing the issue with him and said "we're not gonna go down that road." We presume these are the conversations to which counsel referred at the evidentiary hearing.

[15] A trial court may grant a new trial if the verdict is against the great weight of the evidence. MCR 2.611(A)(1)(e). We review for an abuse of discretion a trial court's decision on a motion for a new trial. *People v Hammerlund*, 337 Mich App 598, 615; 977 NW2d 148 (2021). We review a trial court's decision regarding whether a verdict was against the great weight of the evidence under the same standard. *People v Kosik*, 303 Mich 146, 154; 841 NW2d 906 (2013). A trial court abuses its discretion when it chooses an outcome outside the range of reasonable and principled

-18-

The carjacking statute, MCL 750.529a, provides in relevant part:

> (1) A person who in the course of committing a larceny of a motor vehicle uses force or violence or the threat of force or violence, or who puts in fear any operator, passenger, or person in lawful possession of the motor vehicle, or any person lawfully attempting to recover the motor vehicle, is guilty of carjacking, a felony punishable by imprisonment for life or for any term of years.

> (2) As used in this section, "in the course of committing a larceny of a motor vehicle" includes acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the motor vehicle.

Carjacking is a specific intent crime, requiring the prosecution to establish beyond a reasonable doubt that "the defendant's acts occurred during an attempt to commit, during the commission of, or after the commission of a larceny of a motor vehicle" and that the defendant intended "to steal or permanently deprive a person of the motor vehicle." *People v Smith*, 336 Mich App 297, 307; 970 NW2d 450 (2021). Larceny is the only element at issue here.

Our Supreme Court has held that "in an attempt to commit the larceny" applied in situations where a defendant "makes 'an effort' or undertakes an 'overt act' " intending to deprive another of their property, though the defendant does not actually deprive the other of their property. *People v Williams*, 491 Mich 164, 174; 814 NW2d 270 (2012). See *Smith*, 336 Mich App at 307 (noting the Supreme Court's holding in *Williams*). The specific intent to permanently deprive the owner of their property "does not require, in a literal sense, that a thief have an intent to permanently deprive the owner of the property." See *People v Harverson*, 291 Mich App 171, 178; 804 NW2d 757 (2010) (quotation marks and citation omitted) (relating to unarmed robbery). Rather, it "includes the retention of property without the purpose to return it within a reasonable time or the retention of property with the intent to return the property on the condition that the owner pay some compensation for its return." *Id*.

UDAA, on the other hand, is found under MCL 750.413, which provides in relevant part:

> Taking possession of and driving away a motor vehicle—Any person who shall, wilfully and without authority, take possession of and drive or take away, and any person who shall assist in or be a party to such taking possession, driving or

---

outcomes. *Hammerlund*, 337 Mich App at 615. To grant a motion for a new trial based on the great weight of the evidence, the evidence must "preponderate[] so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *Kosik*, 303 Mich App at 154 (quotation marks and citation omitted). A verdict is against the great weight of the evidence "only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009).

taking away of any motor vehicle, belonging to another, shall be guilty of a felony . . . .

To convict a defendant of UDAA, the prosecution need not prove a specific intent to permanently deprive the owner of their vehicle. *People v Hendricks*, 446 Mich 435, 449; 521 NW2d 546 (1994). The prosecution must instead prove "that the defendant intended to take possession of the vehicle and drive it away. It does not matter whether the defendant intended to keep the vehicle." M Crim JI 24.1.

Bowman challenges the intent element of each offense. He asserts that because the prosecution failed to present evidence contradicting his belief that the truck was his own, his conviction must be reversed. We disagree. This Court has previously held that "[c]onflicting testimony alone will not typically warrant reversal." See *People v Roper*, 286 Mich App 77, 90; 777 NW2d 483 (2009). "Rather, where there is conflicting testimony, unless it can be said that directly contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination." *Id.*

Here, the prosecution presented evidence that Bowman kept the truck without intending to return it to Grindstaff within a reasonable time and that he intended to take possession of it and drive away. Bowman's testimony admitted as much, though he claimed he entered the truck because he mistakenly thought it was his own. Bowman's daughter testified, however, that when they first saw the truck, she and Bowman agreed that it was not his truck. But, she testified, after they left the gas station, Bowman said to turn around and they followed Grindstaff to his home. Bowman's daughter also indicated that "probably twice" she told Bowman that the truck they followed was not his, and she agreed that Bowman said "[t]hat's not my truck." Despite these apparent acknowledgements, Bowman jumped out of the vehicle after Grindstaff walked into his home carrying his child. Though she left the scene because she "didn't want to deal with any of that," Bowman's daughter agreed that she told officers that she "kind of had an idea of what was going on."

The trial court instructed the jury that when deciding whether Bowman intended to carjack or unlawfully drive away a motor vehicle it had to consider whether he acted as he did because of a mistake. The court instructed the jury that if Bowman drove away the vehicle because of an honest mistake "then he did not take the motor vehicle intentionally and [was] not guilty of" carjacking or UDAA. The jury's verdict demonstrates, however, that the jurors rejected the defense theory as an explanation for Bowman's actions. Bowman has not shown that the jury's verdict was against the great weight of the evidence.

V. SENTENCING GUIDELINES

Bowman argues that the trial court erred when scoring prior record variable (PRV) 5 and offense variables (OVs) 7, 8, and 18. Relatedly, he argues that defense counsel was ineffective by failing to object to the scoring of these variables.[16] We disagree and address each in turn.

## A. PRV 5

Bowman first argues that the trial court erred by scoring PRV 5 at 10 points. On remand, the prosecution conceded that the trial court improperly assessed 10 points for PRV 5 and the trial court agreed that it should have instead assessed 5 points. We agree with Bowman but, as the trial court found below, conclude that the reduction from 10 points to 5 points did not affect his guidelines range.

A defendant is entitled to be sentenced based upon accurately scored sentencing guidelines. *People v Francisco*, 474 Mich 82, 89; 711 NW2d 44 (2006). In scoring the factors that form the basis of the sentencing guidelines, the trial court may consider all record evidence, including the presentence investigation report, plea admissions, and testimony at a preliminary examination or trial. See *People v Johnson*, 298 Mich App 128, 130-131; 826 NW2d 170 (2012).

The trial court properly determined that PRV 5 should have been assessed 5 points, not 10. PRV 5 relates to prior misdemeanor convictions. MCL 777.55(1). A court must assess 10 points for PRV 5 when the offender has three or four prior misdemeanor convictions. MCL 777.55(1)(c). The prosecution conceded on remand that the trial court improperly assessed 10 points for PRV 5 because Bowman had only two qualifying prior misdemeanor convictions. A score of 5 points is warranted when the offender has two prior misdemeanors. See MCL 777.55(1)(d). The court agreed that 5 points should have been assessed under PRV 5, noting, however, that subtracting 5 points resulted in a reduction of the total PRV score from 125 to 120. Despite this reduction, Bowman remained at Level F and his guidelines range did not change. See MCL 777.62 (providing minimum sentence ranges for Class A). The trial court did not err on remand by finding that PRV 5 should have been assessed 5 points instead of 10 points.

## B. OV 7

Bowman next argues that the trial court erred by scoring OV 7 at 50 points. We disagree.

Under MCL 777.37(1)(a), OV 7 should be scored at 50 points if "[a] victim was treated with sadism, torture, excessive brutality, or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." "OV 7 is designed to respond to particularly heinous instances in which the criminal acted to increase a victim's fear by a

---

[16] "This Court reviews for clear error a trial court's findings in support of a particular score under the sentencing guidelines but reviews de novo whether the trial court properly interpreted and applied the sentencing guidelines to the findings." *People v Haynes*, 338 Mich App 392, 435; 980 NW2d 66 (2021) (quotation marks and citation omitted). Though a jury must find facts supporting the elements of a crime beyond a reasonable doubt, a sentencing court's "factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).

substantial or considerable amount." *People v Rodriguez*, 327 Mich App 573, 578; 935 NW2d 51 (2019) (quotation marks and citations omitted).

The probation department agent scored OV 7 at 50 points "for egregious conduct by the defendant continuing to drive the vehicle while being fully aware that the victim was hanging outside the vehicle." On remand, the trial court found that 50 points were appropriately assessed for OV 7, stating:

> In reviewing the parameters for OV 7, I think it's appropriately scored because . . . defendant continued to steal and/or attempt to drive off with the truck while the victim was hanging off the truck. . . . [T]he defendant nonetheless continued to operate the vehicle and increase its speed out of the driveway, then down the road with the [victim] hanging precariously off the door on the passenger side of the truck. It cannot be argued seriously that that is not egregious conduct. And based on the totality of the circumstances and the evidence that was presented at the trial, defendant's actions put the victim in serious harm and possibly his life was in jeopardy which would constitute egregious conduct. OV 7 was scored properly at 50 points.

The court found that the fourth category—similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense—applied.

Under the "egregious conduct" category, "[t]he relevant inquiries are (1) whether the defendant engaged in conduct beyond the minimum required to commit the offense; and, if so, (2) whether the conduct was intended to make a victim's fear or anxiety greater by a considerable amount." *Hardy*, 494 Mich at 443-444. Carjacking requires, in relevant part, that a defendant in the course of committing a larceny of a motor vehicle put "in fear . . . any person in lawful possession of the motor vehicle or any person lawfully attempting to recover the motor vehicle[.]" MCL 750.529a(1). It does not require a defendant to drive off with the owner still hanging onto the car. See *id*.

The trial court did not clearly err in assessing 50 points for OV 7. A preponderance of the evidence established that in the course of committing the larceny, Bowman drove at approximately 20 to 30 miles per hour for 60 to 100 yards while Grindstaff was hanging onto the truck with one of his feet dragging outside the vehicle. Continuing to drive the vehicle at that speed for that distance with Grindstaff hanging out of the vehicle was not necessary to commit the crime of carjacking. Grindstaff also testified that Bowman's behavior frightened him. He indicated Bowman was eerily calm for the situation, and that he was scared because he did not know whether Bowman was "taking him to the woods" or to "someplace where he had friends." This was egregious conduct designed to substantially increase the fear and anxiety Grindstaff suffered during the offense. The trial court therefore did not clearly err by assessing 50 points for OV 7.

## C. OV 8

Bowman next argues that the trial court erred by scoring OV 8 at 15 points.[17] We disagree.

A trial court properly assesses 15 points for OV 8 when "[a] victim was asported to another place of greater danger or to a situation of greater danger or was held captive beyond the time necessary to commit the offense." MCL 777.38(1)(a). The statute does not require "that the movement be greater than necessary to commit the sentencing offense." *People v Barrera*, 500 Mich 14, 21; 892 NW2d 789 (2017). "[M]ovement of a victim that is incidental to the commission of a crime nonetheless qualifies as asportation." *Id*. at 17. Asportation may also "occur even when the victim voluntarily accompanied the defendant to a place or situation of greater danger." *People v Dillard*, 303 Mich App 372, 379; 845 NW2d 518 (2013), overruled in part on other grounds by *Barrera*, 500 Mich at 22.

The probation department agent assessed 15 points for OV 8 "because the victim was held in the vehicle even after the victim showed the defendant proof (i.e. registration) that the vehicle did not belong to the defendant and the victim was transported to a stranger's home before he was able to get out of the vehicle and re-claim his truck." The trial court found, in relevant part, that Grindstaff was asported from his home to another place and that he "had no idea where he was going. And where they ended up, the victim had no idea really where he was, whose house it was, or any of . . . those issues. . . . He without question was not safer than where he was at his home, and he didn't ask to be drug [sic] down the road and/or driven to another unknown location." The trial court found that the evidence warranted a score of 15 points for OV 8.[18]

Although Grindstaff voluntarily entered the truck, he did so in an attempt to stop the theft of his truck. See *Dillard*, 303 Mich App at 379 (noting that asportation may still occur even if the victim voluntarily accompanies the defendant to a place or situation of greater danger). After Grindstaff provided proof that the truck belonged to Grindstaff, defendant continued to drive the truck with Grindstaff inside away from Grindstaff's home to an unknown location. "A victim is asported to a place or situation involving greater danger when moved away from the presence or observation of others." *People v Chelmicki*, 305 Mich App 58, 70-71; 850 NW2d 612 (2014). After the truck left the driveway of Grindstaff's home, his wife could no longer observe him. As noted under OV 7, Grindstaff also testified that he was scared because he did not know whether Bowman was taking him to a location in the woods or to a place where Bowman had friends. Though Bowman inevitably arrived at his father's home, this was undoubtedly a place of less safety than Grindstaff's home. *Id*. The trial court did not err by assessing 15 points for OV 8.

D. OV 17

---

[17] Since UDAA is a property offense, OV 8 is not applicable and is not scored.

[18] We observe that the trial court's findings would also support scoring 15 points under OV 8's alternative prong for holding the victim captive beyond the time necessary to commit the offense. See *People v Carter*, unpublished per curiam opinion of the Court of Appeals, issued January 19, 2017 (Docket Nos 326442, 326467), pp 9-10, vacated in part on other grounds in 503 Mich 891 (2018).

Bowman also argues that the trial court erred by assessing 10 points for OV 17. We disagree.

The trial court scores OV 17 for crimes against a person if the offense involved the operation of a vehicle. See MCL 777.22(1). The court assesses 10 points under OV 17 if "[t]he offender showed a wanton or reckless disregard for the life or property of another person." MCL 777.47(1)(a). Wantonness is conduct that indicates that "the actor is aware of the risks but indifferent to the results." *People v Feezel*, 486 Mich 184, 196; 783 NW2d 67 (2010) (quotation marks and citation omitted). Reckless disregard exists when the conduct demonstrates "indifference to the rights of others that is equivalent to a criminal intent." *People v Schaefer*, 473 Mich 418, 438; 703 NW2d 774 (2005).

The probation department agent scored OV 17 at 10 points "due to the defendant showing a reckless disregard for the victim's life while driving away the vehicle while being fully aware that the victim was hanging outside of the vehicle." The trial court found that a score of 10 points for OV 17 was warranted because Bowman had a wanton or reckless disregard for Grindstaff's life or property when he stole Grindstaff's truck, dragged him down the road, and moved him to an unknown location.

Bowman argues that the trial court erred by assessing 15 points for OV 17 because defendant did not drag Grindstaff "for a very long distance." The trial court properly noted, however, that nothing in the plain language of MCL 777.47(1)(a) precludes a court from assessing 10 points under OV 17 on the basis of the duration of the wanton or reckless conduct. A preponderance of the evidence established that Bowman drove the truck for at least 60 yards at a speed of at least 20 miles per hour while Grindstaff was being dragged outside the truck and trying to enter it. Bowman's conduct demonstrated indifference to the results of his actions and to Grindstaff's rights and thus showed that he had a wanton and reckless disregard for Grindstaff's life. *Feezel*, 486 Mich at 196; *Schaefer*, 473 Mich at 438. The trial court therefore did not err by assessing 15 points for OV 17.

In sum, a reduction of 5 points in the scoring of PRV 5 reduced the total PRV score from 125 to 120. This did not change his placement in Level F (75+ points), see MCL 777.62 (carjacking) and MCL 777.66 (UDAA), and therefore had no effect on his guidelines range for carjacking or UDAA. The scores for OVs 7, 8, and 17 were proper. Bowman's sentencing guidelines range thus did not change and he is not entitled to resentencing. *Francisco*, 474 Mich at 89 n 8; *People v Biddles*, 316 Mich App 148, 156; 896 NW2d 461 (2016). We nonetheless direct the trial court to correct Bowman's Sentencing Information Report to reflect the accurately scored PRV to the extent that it may affect the Michigan Department of Corrections programming available to Bowman.

### E. INEFFECTIVE ASSISTANCE OF COUNSEL RELATED TO SENTENCING

Finally, Bowman argues that defense counsel rendered ineffective assistance of counsel when he failed to object to the scoring of PRV 5 and OVs 7, 8, and 17. We disagree.

The evidence supported the scores for the offense variables. Because defense counsel cannot be deemed ineffective for failing to raise a futile objection, Bowman has not shown that

counsel's inaction in this regard was objectively unreasonable.  See *People v Milstead*, 250 Mich App 391, 401; 648 NW2d 648 (2002).  And because the scoring of PRV 5 did not affect Bowman's guidelines range for either offense, Bowman cannot establish that he was prejudiced by counsel's failure to object to the scoring of PRV 5.  Bowman therefore cannot establish that defense counsel was ineffective by failing to object to the scoring of PRV 5.

      We affirm.

                          /s/ Noah P. Hood
                          /s/ Kathleen Jansen
                          /s/ Kathleen A. Feeney